UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RICHARD J. NELSON, et al.,

               Plaintiffs,

      v.

AIR & LIQUID SYSTEMS
CORPORATION, et al.,

               Defendants.

CASE NO. C14-0162JLR

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

## I.      INTRODUCTION

Before the court are:  (1) Defendant Crane Co.'s ("Crane") motion for summary judgment (Crane Mot. (Dkt. # 155)), and (2) Defendant Carrier Corporation's ("Carrier") motion for summary judgment (Carrier Mot. (Dkt. # 158)).  The court has considered the motions, all submissions filed in support of or opposition thereto, the balance of the

record, and the applicable law.  Being fully advised,[1] the court GRANTS in part and
DENIES in part both motions.

## II.      BACKGROUND

### A.  Mr. Nelson's Service Aboard the U.S.S. Kitty Hawk

Plaintiffs Richard J. Nelson and Stephanie A. Nelson allege that Mr. Nelson was
exposed to asbestos-containing materials as a machinist's mate while serving aboard the
U.S.S. Kitty Hawk.  (3d Am. Compl. (Dkt. # 81) ¶ 3.1.)  Mr. Nelson has been diagnosed
with mesothelioma, a cancer of the lining of the lungs, which he alleges was caused in
part by exposure to asbestos incorporated in the products of Carrier and Crane while he
served aboard the Kitty Hawk.  (*Id.* ¶ 3.2.)  Mesothelioma is a terminal disease.  (*Id.*)

Mr. Nelson entered the United States Navy on May 3, 1960, and served aboard the
Kitty Hawk as a machinist's mate fireman from the day the ship was first commissioned

---

[1]Both Crane and Carrier request oral argument for their respective motions.  (*See* Crane Mot. at 1; Carrier Mot. at 1.)  "[A] district court may not . . . deny . . . a request [for oral argument] when made by a party opposing the motion unless the motion for summary judgment is denied."  *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964).  Plaintiffs, however, did not request oral argument in their opposition to either motion.  (*See* Resp. to Crane (Dkt. # 164) at 1; Resp. to Carrier (Dkt. # 172) at 1.)  Further, a district court's denial of a request for oral argument on a motion for summary judgment does not constitute reversible error in the absence of prejudice.  *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (citing *Fernhoff v. Tahoe Reg'l Planning Agency*, 803 F.2d 979, 983 (9th Cir. 1986)).  There is no prejudice in refusing to grant oral argument where the parties are represented by counsel and have had ample opportunity to develop their legal and factual arguments through written submissions to the court.  *Id.* ("When a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument] . . . .") (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp*., 933 F.2d 724, 729 (9th Cir. 1991) (alterations in *Partridge*).  The issues in Defendants' motions have been thoroughly briefed by the parties, and the court has determined that oral argument would not be of assistance in deciding either motion.  *See* Local Rules W.D. Wash. LCR 7(b)(4).  Accordingly, the court denies Crane's and Carrier's requests for oral argument.

1   on April 29, 1961, until June 30, 1964, when Mr. Nelson left the Navy.  (10/27/14

2   Knudsen Decl. (Dkt. # 164-1) Ex 1; *id.* Ex. 2 (Nelson Dep. Vol. I) at 15:24-17:2, 19:2-8,

3   28:22-23.)  Mr. Nelson sailed on the Kitty Hawk's maiden voyage from Camden, New

4   Jersey, south around Cape Horn, and then north to San Francisco, California, where the

5   ship was placed in dry dock at the Hunter's Point Naval Shipyard for six months.  (*Id.* Ex.

6   2 at 38:10-15, 39:1-5.)

7       Mr. Nelson testified in his deposition that when he joined the ship "[e]verything

8   was brand new."  (*Id.* at 83:10-15, 89:24-25.)  He also testified that a machinist's mate

9   was responsible for maintaining "everything in the engine room," except for the boilers.

10  (*Id.* Ex. 2 at 20:5-20.)  His responsibilities included maintaining all of the pumps

11  throughout the ship, including the feed pumps, and "all types of valves."  (*Id.* at 20:5-20,

12  21:4.)

13      With respect to his work on the ship's pumps, Mr. Nelson testified that he

14  personally performed work on two of the three main feed pumps.  (11/3/14 Knudson

15  Decl. (Dkt. # 172-1) Ex. 9 (Nelson Dep. Vol. I) at 183:1-184:23).)  Mr. Nelson testified

16  that the main feed pumps were higher maintenance than some of the other pumps because

17  the main feed pumps needed to be "looked at on a continuous basis."  (*Id.* Ex. 9 at 57:3-

18  13.)  He could not recall the manufacturers' names, but described the main feed pumps'

19  function of providing water to the main boilers and recalled that these pumps were

20  subject to maintenance during the ship's overhaul in dry dock.  (*Id.* Ex. 9 at 164:24-

21  165:19.)  He helped to replace the internal gaskets and bonnets associated with the main

22  feed pumps.  (*Id.* Ex. 9 at 165:20-23.)  When asked whether the internal packing and

1  gaskets he worked on were original with the pumps, he indicated that the pumps looked

2  "brand new" and "like they hadn't been disturbed." (*Id.* Ex. 9 at 167:8-23.)  He testified

3  that it was "[h]ighly unlikely" that the pumps had been disturbed prior to his work upon

4  them. (*Id.*)  However, he acknowledged that "[t]here could have been" maintenance or

5  repair work performed on the main feed pumps before the Kitty Hawk's initial

6  shakedown cruise around the Horn. (*Id.* Ex. 9 at 167:2-7.)

7          During the haul-out at Hunter's Point, Mr. Nelson's main responsibility was to

8  clean up after other workers and occasionally help other machinist's mates work on the

9  Kitty Hawk's various equipment. (*Id.* Ex. 9 at 190:22-191:4.)  Mr. Nelson testified that

10  he observed and was only two to three feet away when other workers removed the

11  gaskets and packing from the main feed pumps. (*Id.* Ex. 9 at 168:8-20.)  Naval archive

12  records substantiate Mr. Nelson's testimony about the work performed on the main feed

13  pumps during the Kitty Hawk's haul-out in 1961. (*Id.* Ex. 10; *see also* Lowell Rept.

14  (Dkt. # 144) Ex. 23.)  Mr. Nelson also recalled that it was "standard procedure" for the

15  manufacturers to leave spare packing and gaskets as replacement parts for their own

16  pumps. (*Id.* Ex. 9 at 168:21-171:15.)  He acknowledged, however, that he did not know

17  for certain that the replacement parts used in this particular instance came from the

18  pump's manufacturer or not. (*Id.* Ex. 9 at 173:16-19.)

19          With respect to his work on the ship's valves, Mr. Nelson testified that he could

20  tell that the valves he worked on were new and had not been previously worked on

21  because the valves did not look as if they had been disturbed and appeared to still have

22

1    the original paint.[2]  (*See id*. Ex. 9 at 193:10-13.)  He also testified that the valve

2    manufacturers supplied "the equipment, the packing and gaskets and everything else" that

3    was needed to maintain or fix the valves.[3]  (*See* 10/27/14 Knudsen Decl. Ex. 3 (Nelson

4    Dep. Vol. II) at 17:15-20.)

5         Mr. Nelson acknowledged, however, that although the valves appeared to have

6    original paint, he did not definitively know if the valves had been repainted after original

7    testing.  (*See* 11/3/14 Knudsen Decl. Ex. 9 at 193:18-20.)  He also acknowledged that the

8    Kitty Hawk was launched in 1958 or 1959 (Duvall Decl. (Dkt. # 156-1) Ex. B at 156:9),

9    and that he does not know the maintenance history of the Kitty Hawk between the time it

10   _____

11        [2] In their response to Crane's motion, Plaintiffs cite a different portion of Mr. Nelson's
     deposition for this proposition.  (*See* Resp. to Crane at 3 (citing 10/27/14 Knudsen Decl. Ex. 2 at
12   176:18-177:2).)  However, although the portion of Mr. Nelson's deposition Plaintiffs' cite is
     quoted in Plaintiffs' brief (Resp. to Crane at 3), the court could not find it in counsel's sworn
13   declaration.  (*See generally* 10/27/14 Knudsen Decl.; *see also generally* 11/3/14 Knudsen Decl.)
     Therefore, the court does not rely upon this portion of Mr. Nelson's deposition in its ruling.

14
          [3] Crane asserts that the court may not rely on this portion of Mr. Nelson's testimony
15   because Plaintiffs have not established that Mr. Nelson had personal knowledge to make this
     assertion.  (Crane Reply (Dkt. # 171) at 3, n.2.)  Crane, however, failed to object at the time that
16   Mr. Nelson offered this testimony.  (*See* 10/27/14 Knudsen Decl. Ex. 3 at 17:15-20.)  A party
     waives certain objections, such as to the form of questions or answers or to other errors that
17   might be obviated, removed, or cured if promptly presented, by failing to make the objection at
     the deposition.  *See* Fed. R. Civ. P. 32(d)(3)(B).  Accordingly, Crane waived its opportunity to
18   object to this testimony.  *See Franklin v. Sac. Area Flood Control Agency*, No. CIV. 07-1263
     WBS GGH, 2009 WL 2399569, at *6, n.7 (E.D. Cal. Apr. 29, 2009) ("The court overrules
19   defendants' objection to plaintiff's testimony concerning other managers' timekeeping for lack
     of personal knowledge and lack of foundation. The record indicates that defendants did not
20   challenge plaintiff's statements at the time of the deposition"); *see also* 8 Charles Alan Wright &
     Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2113 (2010) ("A party waives any objection,
21   whether to the form of questions or answers or to other errors that might be obviated, removed,
     or cured if promptly presented, by failing to note the objection at the taking of the deposition.");
22   *Jerden v. Amstutz*, 430 F.3d 1231, 1237 (9th Cir. 2005) ("[A]n objection to admission of
     evidence on foundational grounds must give the basis for objection in a timely way to permit the
     possibility of cure.").

ORDER- 5

1  was launched and its maiden voyage in 1961, two or three years later (*id.* Ex. B at

2  156:10-24).  He also acknowledged that he has no specific memory of the maintenance

3  history of any particular Crane valve or whether any of the valves on which he worked

4  contained their original component parts.  (*See id.* Ex. C at 207:13-209:2.)  In addition, he

5  acknowledged that he did not know if any of the valve manufacturers supplied the

6  gaskets to be used with their equipment.  (*Id.* Ex. A at 135:5-8.)

7       Mr. Nelson testified in deposition that, during the haul-out at Hunter's Point Naval

8  Shipyard, he worked on some of the Kitty Hawk's pumps and valves and also stood

9  watch.  (10/27/14 Knudsen Decl. Ex. 2 at 39:1-5, 40:8-13.)  As he stood watch, he

10  observed or assisted when yard or civilian workers repaired and overhauled valves or

11  pumps and he also cleaned up after the civilian workers.  (*Id.* Ex. 2 at 39:1-5, 40:14-

12  41:17, 43:16-24, 47:2-12, 47:18-48:10.)  He noted that "dust would be everywhere," and

13  he "would be breathing it all the time."  (*Id.* Ex. 2 at 41:5-8, 50:11-24.)  After the

14  overhaul, Mr. Nelson continued to maintain valves aboard the Kitty Hawk.  (*See id.* at

15  70:17-19.)  His duties included overhauling valves throughout the auxiliary spaces and

16  engine rooms, which created dust when he scraped gaskets off the valves.  (*Id.* at 73:24-

17  74:20.)

18       Near the end of his service, Mr. Nelson was transferred to the air conditioning,

19  refrigeration, and steam heat division aboard the Kitty Hawk.  (*Id.* at 67:18-68:13.)  He

20  removed used packing from valves in this position as well, which also created dust.  (*Id.*

21  at 68:14-69:22.)  One major project involved an overhaul of the Admiral's air

22  conditioning unit.  (11/3/14 Knudsen Decl. Ex. 9 at 70:17-73:18.)  Mr. Nelson took the

1  industrial-sized air conditioning unit almost completely apart.  (*Id.* Ex. 9 71:22-25.)  He

2  worked on "asbestos gaskets," scraping and replacing some with new asbestos gaskets,

3  and removing old packing and replacing it with new.  (*Id.* Ex. 9 at 72:20-73:16.)  This

4  activity created "a little bit" of dust.  (*Id.* Ex. 9 at 72:17-18.)

5      **B.  Evidence Concerning Crane Valves, Gaskets, and Packing**

6      Mr. Nelson testified unequivocally that Crane valves were prevalent on the Kitty

7  Hawk while he was assigned there.  (10/27/14 Knudsen Decl. Ex. 2 at 21:4-5 ("Crane

8  [valves] . . . were all over the ship . . . ."); *id.* Ex. 2 at 50:7-8 ("[T]here were Crane

9  [valves] . . . throughout the ship . . . .").)  Mr. Nelson recalls working with Crane valves

10  when he removed original packing from Crane valves and when he installed new

11  packing.  (*Id.* Ex. 4 at 4.)  Specifically, Mr. Nelson recalls working with or around the

12  following types of Crane valves on the Kitty Hawk:  (1) Class 400 and 600 cast steel

13  pipe-line gate valves, (2) cast steel wedge gate valves (600-pound flange, 1500-pound

14  socket-welding), (3) bronze low pressure flanged globe valves, (4) bronze flanged globe

15  type hose valves, and (5) bronze low pressure flange angle valves.  (*Id.*)

16      A 1960 Crane Valves and Fittings Catalog indicates that Crane manufactured and

17  sold all of the foregoing categories of valves.  (*Id.* Ex. 5 at 132-33, 166-67, 231, 236.)

18  The Catalog also indicates that Crane supplied its steel and bronze valves with asbestos-

19  containing packing material (*id.* Ex. 5 at 10), and that Crane sold Cranite Sheet Packing

20  which was "made from an asbestos composition" and manufactured solely for Crane (*id.*

21  Ex. 5 at 320).

22

1   Naval architect records from 1958-59 are consistent with Mr. Nelson's testimony

2   that the Kitty Hawk was initially built with a variety of Crane valves.  (*See id.* Ex. 6.)  In

3   addition, an October 29, 1959, vendor drawing approval request form for angle stop

4   valves includes a Crane drawing of a 600 pound cast steel valve, and part number 8 is

5   packing comprised of "braided asbestos rings."  (*Id.* Ex. 7.)

6   Plaintiffs also offer a September 21, 1964, purchase order, which indicates that

7   Crane provided a horizontal swing check valve to the Kitty Hawk when the vessel was

8   overhauled in 1964.  (10/27/14 Knudsen Decl. Ex. 8.)  The order included repair parts,

9   and a subsequent change order indicates that Crane was to supply the cap gasket for the

10   swing check valve as well.  (*See id.*)  Although this document post-dates Mr. Nelson's

11   service, Plaintiffs assert that it creates a reasonable inference that Crane supplied

12   asbestos-containing replacement parts during the course of Mr. Nelson's service.

13   Finally, Plaintiffs offer the testimony of naval expert, Captain William A. Lowell.

14   (*See generally* Lowell Rpt. (Dkt. # 144).)  Captain Lowell bases his opinion on Mr.

15   Nelson's deposition testimony in which he specifically recalled working on valves after

16   the first shakedown cruise and that he removed original packing and gaskets from the

17   valves.  (*Id.* at 28.)  He also bases his testimony on his review and analysis of documents

18   he obtained from the National Archives.[4]  (*Id.* at 29.)  Captain Lowell has opined that

19

20   [4] Crane does not object to Captain Lowell's testimony as an expert witness based on
21   Federal Rules of Evidence 702 or 703 or based on *Daubert v. Merrell Dow Pharmaceuticals,*
     *Inc.*, 509 U.S. 579 (1993), and its progeny.  (*See generally* Mot.)  Instead, Crane objects based to
22   Captain Lowell's testimony based on Federal Rule of Evidence 602, arguing that Captain Lowell
     has no personal knowledge of Mr. Nelson's service or work aboard the Kitty Hawk.  (Crane

1  most valves for the steam lines on the Kitty Hawk had asbestos materials on and in them

2  when the aircraft carrier was first built.  (Lowell Rpt. at 28.)  In Captain Lowell's

3  opinion, Mr. Nelson more probably than not came into contact with original asbestos

4  material from Crane valves aboard the Kitty Hawk during Mr. Nelson's first year of

5  service aboard and during the ship's overhaul at Hunter's Point Naval Shipyard.  (*Id.* at

6  29-30.)  Captain Lowell opines that Mr. Nelson more probably than not came into contact

7  with these asbestos-containing materials while working on the valves himself as well as

8  when he cleaned up dust and debris after yard workers overhauled the valves.  (*Id.* at 29.)

9  Captain Lowell also opines that a significant amount of the asbestos materials with which

10 Mr. Lowell had contact was probably original material supplied by Crane considering

11 how new the ship was.  (*Id.* at 30; *see also id.* at 34 ("Considering the newness of the

12 Kitty Hawk during the rest of Mr. Nelson's tenure on the ship, it is more probable than

13 not that he came in contact with original asbestos-containing packing, gasket and

14 insulation material from Crane . . . valves . . . .").)

15 //

16

17 Reply at 4); *see* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is
   introduced sufficient to support a finding that the witness has personal knowledge of the
18 matter.")  Although Captain Lowell obviously was not on board the Kitty Hawk at the time Mr.
   Nelson served, his opinion testimony is informed by his review of Mr. Nelson's deposition
19 testimony, his decades-long career in the Naval Reserves, his educational and professional
   background as a naval engineer, and his review of pertinent documents from the National
20 Archives.  (*See* Lowell Rpt. at 5-16.)  An expert may base his opinions on facts and data in the
   case about which the parties have informed him or her.  *See* Fed. R. Evid. 703 ("An expert may
21 base an opinion on facts or data in the case that the expert has been made aware of or personally
   observed.").  Moreover, Federal Rule of Evidence 602, upon which Crane bases its objection
22 to Captain Lowell's testimony, expressly does not apply to expert opinion testimony.  *See* Fed. R.
   Evid. 602 ("This rule does not apply to a witness's expert testimony under Rule 703.").  The
   court, therefore, overrules Crane's Rule 602 objection to Captain Lowell's expert testimony.

## C.  Evidence Concerning Carrier Equipment

Mr. Nelson asserts that he was exposed to asbestos from Carrier turbines that were attached to Ingersoll Rand main feed pumps, as well as from Carrier air conditioning units that Mr. Nelson work on or around during his tenure aboard the Kitty Hawk.  (*See* Resp. to Carrier at 1, 3-10.)  In his deposition, however, Mr. Nelson does not specifically identify Carrier as the manufacturer of turbines, pumps, or any other equipment aboard the Kitty Hawk.  He testifies that he worked on the main feed pumps that are attached to auxiliary turbines, but does not specifically connect either the pumps or the turbines to Carrier.  (*See* 11/3/14 Knudson Decl. Ex. 9 at 183:1-184:23; *see also id.* at 57:3-13).)  With respect to turbines on the Kitty Hawk, his only relevant deposition testimony is as follows:

Q:  Did you ever work on any turbines?

**********

A:  [T]here's some pumps that have turbines.  I worked on a couple – helped work on a couple of those.

Q:  Can you tell me which pumps?

A:  No. . . .

(11/3/14 Knudsen Decl. Ex. 12 at 49:15-50:8.)

Although Mr. Nelson generally associates the name Carrier with air conditioning and refrigeration units, he has no specific recollection of seeing the name Carrier during any of his work aboard the Kitty Hawk.  (Mackenzie Decl. (Dkt. # 159) Ex. B (Nelson Dep. Vol. II) at 210:3-16.)

1    In the absence of any testimony from Mr. Nelson connecting his work or products

2   aboard the Kitty Hawk to Carrier, Plaintiffs rely upon testimony from their naval expert,

3   Captain Lowell, to connect the causation dots for their claims against Carrier.  Captain

4   Lowell opines that Carrier turbines and air conditioning units were aboard the Kitty

5   Hawk during Mr. Nelson's tenure there.  (Mackenzie Decl. Ex. A at 240:3-17.)

6   Specifically, Mr. Lowell testifies that there were 12 feed pumps with associated Carrier

7   turbines and seven Carrier air conditioning units aboard the Kitty Hawk.  (*Id.*)

8    Mr. Lowell's testimony is based in part on naval archive records.  (*See* 11/3/14

9   Knudsen Decl. Exs. 1-3.)  With regard to the air conditioning units, he relies upon a

10  document entitled "Report of Final Acceptance Trials and Material Inspection of USS

11  Kitty Hawk (CVA-63) HELD 20-24 November 1961 By Board of Inspection and

12  Survey" ("1961 Report of Final Acceptance").  (*See id.* Ex. 1.)  This document lists a

13  variety of refrigeration and air conditioning units, including five pieces of "York

14  Company (three 8.4-ton and two 8.9 ton) refrigeration equipment" and seven pieces of

15  "York Company and Carrier (six units 175-ton each and one unit 25-ton) air conditioning

16  equipment" that "operated satisfactorily during the trials . . . ."  (*Id.* Ex. 1 at VIII-11.)

17  Despite the phraseology, Captain Lowell opines based on this document that Carrier

18  manufactured the seven air conditioning units aboard the Kitty Hawk while York

19  Company manufactured the five refrigeration units.  (Mackenzie Decl. Ex. A at 254:1-

20  24.)

21   Plaintiffs also offer evidence that the only legitimate place to obtain replacement

22  parts for Carrier air conditioning equipment aboard a naval vessel was from Carrier or a

ORDER- 11

1    Carrier-authorized parts dealer.  (*See* Knudsen Decl. Ex. 13.)  Specifically, Plaintiffs

2    offer deposition testimony from Carrier's Federal Rule of Civil Procedure 30(b)(6)

3    deponent in another asbestos litigation.  (*See id.*)  This Rule 30(b)(6) deponent testified

4    that Carrier or a Carrier marine dealer was the only authorized supplier of replacement

5    parts for Carrier products utilized by the Navy.[5]  (*See id.*)

6           There is no dispute that Carrier did not manufacture the main feed pumps aboard

7    the Kitty Hawk.  Captain Lowell has offered expert testimony that Ingersoll-Rand

8    manufactured the main feed pumps.  (*See* Lowell Rpt. at 23 ("[T]he [main feed] pumps

9    were manufactured by Ingersoll-Rand . . . .").)  Although Carrier has not conceded that it

10   manufactured the turbines associated with the main feed pumps (*see generally* Carrier

11   Mot.), Captain Lowell has offered expert testimony that these turbines were Carrier-

12   manufactured (*see* Lowell Rpt. at 23).  In asserting this opinion, Captain Lowell relies in

13   part upon an April 25, 1956, letter from the Bureau of Ships to Ingersoll-Rand Company.

14   (*See* 11/3/14 Knudsen Decl. Ex. 2.)  The April 25, 1956 letter states in its subject line:

15   "AIRCRAFT CARRIER (CVA63), Contract NObs-67763 with Ingersoll-Rand

16   Company; main feed pump turbines, Carrier Corporation, manufacturer, drawing

17   approval."  (*Id.*)  In addition, a second letter, dated August 20, 1956, has an identical

18   subject line, and lists 13 different Carrier drawings that the Navy approved.  (*Id.* Ex. 3.)

19

20   _____

21        [5] Carrier did not object to Plaintiffs' reliance on this testimony in its reply memorandum.
     (*See generally* Carrier Reply (Dkt. # 173)); *see* Fed. R. Civ. P. 32(a)(3).

22

Captain Lowell also asserts that the main feed pumps (manufactured by Ingersoll-Rand) and the turbines (manufactured by Carrier) were an integrated system. (*See* 11/3/14 Knudsen Decl. Ex. 4 at 249:4-23.)  Specifically, he testified as follows:

> Q:  [I]n your experience, how distinct are these two pieces of equipment?  Is the auxiliary turbine incorporated into the main feed pump or is it a separate piece of equipment attached with . . . valves and flanges and piping?
>
> A:  All on one skid, all on one foundation, and you treat it as a whole.  If you haven't got a turbine, you haven't got a feed pump.  If you haven't got a feed pump the turbine is worthless.  They are physically hooked, flexibly coupled with flexible couplings, all on the same base.
>
> **********
>
> A:  The feed pump and the turbine are all on the same foundation. . . . [T]hey'll share the same lube oil system.  They are sold as a whole and they've got to be tested before they ever get it to the shipyard.  That's really my best description I can give you.

(*Id.*)  Plaintiffs also cite to certain naval architect records to evince the integrated nature of these two pieces of equipment.  (*See e.g.*, 11/3/14 Knudsen Decl. Exs. 5-8.)

Captain Lowell's testimony, however, concerning whether Mr. Nelson viewed the main feed pump and auxiliary turbines as an integrated system or whether Mr. Nelson worked on the portion of the system manufactured by Carrier—the auxiliary turbines—is equivocal:

> Q:  So I believe you just said that Mr. Nelson testified that he did some work on the main feed pumps?
>
> A:  Somewhere I have a recollection in the depositions, yes, sir.
>
> Q:   All right.  Do you have any recollection of him testifying that he worked on the auxiliary turbines attached to the main feed pumps?

A:  Well, when you talk feed pumps you talk about the sum total, you don't talk necessarily about the turbine.  If he worked on a feed pump, he may have been working on the turbine, he may have been working on the feed pump, don't know.

Q:  So are ---

A:  It's a whole from his perspective and my perspective.

Q:  Well, you don't necessarily know what his perspective was as far as delineating between two pieces of equipment, do you?

A:  I don't know with certainty, but I know he that he was working—he said he worked on the main feed pumps.  That's all I know.

(Mackenzie Decl. Ex. A at 248:3-24.)

As noted above, although Mr. Nelson testified that he worked on the main feed pumps, he never testified that he worked on the auxiliary turbines and never testified that he was near the auxiliary turbines while others were working on them.  At most, he testified that he worked on main feed pumps, which Carrier did not manufacture.

**D.  Evidence Concerning Mr. Nelson's Exposure to Asbestos and Its Contribution to His Mesothelioma**

Plaintiffs offer the testimony of an industrial hygiene expert, Ms. Susan Raterman. (Raterman Rpt. (Dkt. # 146).)  She opines to a reasonable degree of scientific certainty that Mr. Nelson was occupationally exposed to asbestos both directly and as a bystander during his service aboard the Kitty Hawk.  (*Id.* at 8.)  She also opines that each occupational exposure to asbestos from his work pertaining to Crane valves and Carrier pump turbines contributed to his overall asbestos dose.  (*Id.*)  She also opines that Mr. Nelson's hands-on work and as a bystander aboard the Kitty Hawk would have exposed him to significant concentrations of asbestos dust tens of thousands to tens of millions

1    times greater than background levels, which would have increased his risk of developing

2    mesothelioma.[6]  (*Id.* at 8-9.)

3         Finally, Plaintiffs offer the testimony of occupational and environmental medicine

4    expert, Dr. Carl Brodkin, who opines to a high degree of medical certainty that Mr.

5    Nelson's malignant pleural mesothelioma was causally-related to his direct and/or

6    bystander occupational exposure to asbestos-containing gaskets, packing, and insulation

7    on hot, steam, and high pressure systems aboard the Kitty Hawk, including those

8    associated with valves.  (Brodkin Decl. (Dkt. # 164-2) ¶ 18.)   Dr. Brodkin also opines

9    that to a high degree of medical certainty that Mr. Nelson's work around main boiler feed

10   pumps and Crane valves contributed to his lifetime asbestos dose and was a substantial

11   contributing factor in the development of his mesothelioma.  (*Id.* ¶ 25; 11/3/14 Knudsen

12   Decl. Ex. 15 at 191:11-192:9; *see also id.* at 102:23-103:19; 218:17-219:15.)

13   ### III.    ANALYSIS

14        Mr. Nelson alleges claims of negligence and strict product liability against a

15   variety of defendants including both Crane and Carrier based on his exposure to asbestos-

16

17       [6] Crane does not object to Ms. Raterman's testimony as an expert witness based on
Federal Rules of Evidence 702 or 703 or on the basis of *Daubert*, 509 U.S. 579, and its progeny.

18   (*See generally* Crane Mot.)  Instead, Crane objects to Ms. Raterman's testimony in its reply
memorandum based on Federal Rule of Evidence 602 that Ms. Raterman has no personal

19   knowledge of Mr. Nelson's service and work aboard the Kitty Hawk.  (Crane Reply at 4.)
However, as explain in footnote 4 above, an expert may base her opinions on facts and data in

20   the case about which the parties have informed her.  *See* Fed. R. Evid. 703.  Ms. Raterman states
that she bases her opinions on her "training and experience as an industrial hygienist," her

21   "review of the scientific literature," and specific, case-related materials, including the videotaped
deposition of Mr. Nelson, among other items.  (Raterman Rpt. at 2.)  Further, Rule 602, upon

22   which Crane relies as the basis for its objection, does not apply to expert opinion testimony.  (*See*
*supra* n.4.)  Accordingly, the court overrules Crane's Rule 602 objection.

1  related products during his service aboard the Kitty Hawk.  (*See* 3d Am. Compl. (Dkt.

2  # 81).)  Specifically, Mr. Nelson alleges in part that Defendants are liable for "negligent

3  and unsafe design; failure to inspect, test, warn, instruct, monitor and/or recall," and for

4  "marketing or installing products not reasonably safe for lack of adequate warning."  (*Id.*

5  ¶ 4.1.)

6       Crane moves for summary judgment on Mr. Nelson's product liability and

7  negligence claims on grounds that there is insufficient evidence that Mr. Nelson's

8  exposure to asbestos was caused by a Crane product or that the Crane products he was

9  exposed to while he served at the Great Lakes Naval Training Center and aboard the

10  Kitty Hawk contained asbestos.  (Crane Mot. at 3-4.)  Crane bases its motion on

11  Washington law.  (*See id.* at 6-9.)  Carrier moves for summary judgment on similar

12  grounds with respect to Mr. Nelson's exposure to its products.  (Carrier Mot. at 7-11.)

13  Carrier, however, asserts that the law governing this action is federal maritime law.  (*Id.*

14  at 6-7.)  The court will address the standards for summary judgment and the choice of

15  law issue first and then analyze the substance of Crane's and Carrier's motions

16  separately.

17       **A.  Summary Judgment Standards**

18       Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

19  where the moving party demonstrates (1) the absence of a genuine issue of material fact

20  and (2) entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp.*

21  *v. Catrett*, 477 U.S. 317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658

22  (9th Cir. 2007).  The moving party bears the initial burden of production of showing an

1  absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving

2  party does not bear the ultimate burden of persuasion at trial, it can show an absence of

3  issue of material fact in two ways:  (1) by producing evidence negating an essential

4  element of the nonmoving party's case, or, (2) showing that the nonmoving party lacks

5  evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co.,*

6  *Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

7       If the moving party meets its burden of production, the burden shifts to the non-

8  moving party to designate specific facts demonstrating the existence of genuine issues for

9  trial.  *Celotex*, 477 U.S. at 324.  The "mere existence of a scintilla of evidence in support

10  of the plaintiff's position will be insufficient; there must be evidence on which the jury

11  could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

12  252 (1986).  In determining whether the factfinder could reasonably find in the non-

13  moving party's favor, "the court must draw all reasonable inferences in favor of the

14  nonmoving party, and it may not make credibility determinations or weigh the evidence."

15  *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 150 (2000).

16       **B.  Choice of Law**

17       Carrier asserts that maritime and not state law applies to Mr. Nelson's claims.[7]

18  (Carrier Mot. at 6-7.)  Crane relies on Washington state law.  (*See* Crane Mot. at 6-9.)

19  With little analysis and no response to the legal authority cited by Carrier in support of

20

21       [7] The party seeking to invoke admiralty law bears the burden of establishing that it

22  applies.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534
   (1995).

1    the application of maritime law, Plaintiffs assert that the court's jurisdiction rests on

2    diversity of citizenship between the parties and therefore the substantive law of

3    Washington applies to Plaintiffs' claims.  (Resp. to Carrier at 14.)  The fact, however,

4    that Plaintiffs invoked diversity of citizenship jurisdiction rather than admiralty

5    jurisdiction "does not preclude the application of maritime law."  *Carey v. Bahama*

6    *Cruise Lines*, 864 F.2d 201, 206 (1st Cir. 1988); *see also Pope & Talbot, Inc. v. Hawn*,

7    346 U.S. 406, 410-11 (1953); *Preston v. Frantz*, 11 F.3d 357, 358-59 (2d Cir. 1993); *In*

8    *re Air Disaster Near Honolulu, Haw.*, 792 F. Supp. 1541, 1544 (N.D. Cal. 1990)

9    ("General maritime law preempts state law, and must be applied even where, as here,

10   plaintiffs choose not to invoke admiralty jurisdiction and rely instead on diversity

11   jurisdiction.").  In any event, Plaintiffs assert that under either Washington or federal

12   maritime law, the court should deny summary judgment.  (Resp. to Carrier at 14.)

13         Whether maritime law applies to Mr. Nelson's claims is a threshold issue and a

14   question of federal law.  *See* 28 U.S.C. § 1333(1).  Admiralty law applies to Mr. Nelson's

15   claims if his exposure to asbestos meets both a locality test (*i.e.*, the location of the

16   wrong) and a connection test (*i.e.*, whether the wrong bears a significant relationship to

17   traditional maritime activity).  *See, e.g.*, *Taghadomi v. United States*, 401 F.3d 1080,

18   1084 (9th Cir. 2005).

19         There is little, if any, doubt that the locality test is met with respect to Plaintiffs'

20   allegations here.  Under the locality test, the court must determine "whether the tort

21   occurred on navigable water or whether injury suffered on land was caused by a vessel on

22   navigable water."  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S.

527, 534 (1995).  Since *Grubart*, courts "have determined that 'in the case of asbestos-related disease arising from work on or around ships . . . the locality test is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters.'"  *Cabasug v. Crane Co.*, 956 F. Supp. 2d 1178, 1187 (D. Haw. July 25, 2013) (quoting *Connor v. Alfa Laval, Inc.*, 799 F. Supp. 2d 455, 466 (E.D. Pa. 2011)).  Plaintiffs concede that they have no evidence that Mr. Nelson was exposed to asbestos from a Crane product while he was training at the Great Lakes Naval Training Center.  (Resp. to Crane at 1, n.1.)  Thus, the only claims presently before the court against either Crane or Carrier involve alleged exposure to asbestos during Mr. Nelson's work aboard the Kitty Hawk either while it was underway on navigable water or while it was undergoing a major overhaul in dry dock at Hunters Point Naval Shipyard.  "It is well-settled that vessels in drydock are still considered to be in 'navigable waters' for purposes of admiralty jurisdiction."  *Cabasug*, 956 F. Supp. 2d at 1187, n.11 (citing cases).  Thus, the court easily concludes that the locality test for application of admiralty law is satisfied.

With respect to the connection test for application of maritime law, the *Grubart* Court relied upon a two-part inquiry that was first articulated by the Supreme Court in *Sisson v. Ruby*, 497 U.S. 358 (1990).  The *Grubart/Sisson* two-part inquiry focuses on whether (1) the incident has a potentially disruptive impact on maritime commerce, and (2) the general character of the activity giving rise to the incident shows a substantial

relationship to traditional maritime activity.[8]  *Grubart*, 513 U.S. at 534.  "[W]here a worker whose claims meet the locality test was primarily sea-based during the asbestos exposure, those claims will almost always meet the connection test necessary for the application of maritime law."  *Dumas v. ABB Grp., Inc.*, --- F. Supp. 2d ----, 2014 WL 2514492, at *4 (D. Del. 2014) (citing *Connor*, 799 F. Supp. 2d at 467-69); *see also Salisbury v. Asbestos Corp., Ltd.*, MDL No. 875, 2014 WL 345214, at *1, n.1 (E.D. Pa. Jan. 29, 2014).

The first part of the *Grubart/Sisson* connection test—whether the incident has a potentially disruptive impact on maritime activity—is based "on a description of the incident at an intermediate level of possible generality."  *Grubart*, 513 U.S. at 538-39. Therefore, the court "considers whether the general features of the incident could

---

[8] In *Myhran v. Johns-Mansville Corp.*, 741 F.2d 1119 (9th Cir. 1984), the Ninth Circuit held that although the locality test for application of admiralty law was met where the plaintiff was exposed to asbestos products during the repair of a vessel floating on navigable waters, the connection test was not met.  In reaching this conclusion, *Myhran* considered four factors:  "(1) traditional concepts of the role of admiralty law; (2) the function and role of the parties; (3) the types of vehicles and instrumentalities involved; and (4) the causation and nature of the injury suffered."  *Id.* at 1121-22.  Numerous courts, however, have found that this test and similar tests from other circuits no longer control and have been displaced by the one articulated by the Supreme Court in *Grubart*, 513 U.S. at 534 and *Sisson v. Ruby*, 497 U.S. 358 (1990).  *See, e.g.*, *Cabasug*, 956 F. Supp. 2d at 1180-86 (providing exhaustive analysis of the development of the admiralty law test since *Myhran* and concluding that the *Myhran* test has been overruled and supplanted by the *Sisson/Grubart* test); *McClenahan v. Paradise Cruises, Ltd.*, 888 F. Supp. 120, 123 (D. Haw. 1995) (concluding that *Grubart* overruled the multi-factor Ninth Circuit test for the connection test such that the district court is not bound by earlier decisions using the multi-factor test); *Connor*, 799 F. Supp. 2d at 466 ("[A]lthough several courts have rejected the application of maritime law in asbestos products liability suits, more recent cases confirm that the earlier decisions so holding are now in tension with the standard constructed in *Sisson* and retooled in *Grubart*."); *Dumas v. ABB Grp., Inc.*, --- F. Supp. 2d ----, 2014 WL 2514492, at *5-6 (D. Del. 2014).  This court is persuaded by the exhaustive analysis of the *Cabasug* court and others with respect to this issue, and therefore the court utilizes the two-part *Grubart/Sisson* connection test and not the four-part *Myhran* test to determine if maritime law applies here.

1  hypothetically have an effect on maritime commerce," and not whether "any impact

2  actually occurred." *Christensen v. Georgia-Pacific Corp.*, 279 F.3d 807, 815, n.31 (9th

3  Cir. 2002). The Ninth Circuit takes "an inclusive view of what general features of an

4  incident have a potentially disruptive effect on maritime commerce." *In re Mission Bay*

5  *Jet Sports, LLC*, 570 F.3d 1124, 1128 (9th Cir. 2009).

6       Given the foregoing directives, courts have described similar incidents related to

7  asbestos exposure as "injury to workers on Navy ships on navigable waters allegedly

8  caused by defective parts" or "exposure to allegedly defective products on or around

9  Navy ships on navigable waters" *See Dumas*, 2014 WL 2514492, at *4; *Cabasug*, 956 F.

10  Supp. 2d at 1188. Given these descriptions, court have also found such incidents could

11  disrupt maritime commence in a variety of ways, including by creating unsafe working

12  conditions that could cause labor shortages due to fear of harmful exposures by crew or

13  potential crew members, which in turn could disrupt the Navy's ability to protect other

14  commercial ships if called upon to do so. *See Dumas*, 2014 WL 2514492, at *4;

15  *Cabasug*, 956 F. Supp. 2d at 1188; *Connor*, 799 F. Supp. 2d at 467-68; *Lambert*, 70 F.

16  Supp. 2d at 883-84 ("Unsafe working conditions aboard a vessel have consistently been

17  held to pose a potentially disruptive impact upon maritime commerce . . . ."). Thus, like

18  numerous other district courts considering similar cases, this court concludes that the first

19  prong of the connection test is met.

20       The second prong of the *Grubart/Sisson* connection test is that "the tortfeasor's

21  activity must be so closely related to activity traditionally subject to admiralty law that

22  the reasons for applying special admiralty rules would apply. *Grubart*, 513 U.S. at 539-

1  40.  In identifying the activity, the court should "focus on the general character of the

2  activity" as opposed to the "particular [factual] circumstances of the incident" at issue.

3  *Sisson*, 497 U.S. at 363-64.  Yet, the court must not characterize the activity so generally

4  as to "eliminate any hint of maritime connection."  *Grubart*, 513 U.S. at 541-42.  Given

5  this guidance, the court finds that the activity giving rise to the incident here was the

6  manufacture of products for use on Navy vessels.  *See Dumas*, 2014 WL 2514492, at *5

7  ("The products manufactured in this case—boilers, pumps, valves, gaskets, packing, and

8  insulation . . . among others—were essential for the proper functioning of the ships and

9  made for that purpose.") (quoting *Connor*, 799 F. Supp. 2d at 469); *Cabasug*, 956 F.

10 Supp. 2d at 1190.  Indeed, based on his experience with "the process and procedure by

11 which equipment manufacturers participated in the design, installation, use and

12 maintenance of their products on Navy ships," Captain Lowell opines that both Crane and

13 Carrier "were involved in the design and development of military specifications for their

14 equipment," and that "[m]ilitary specifications were not unilaterally dictated by the Navy

15 to equipment manufacturers . . . ," but were "arrived at after consideration, input,

16 expertise and advice from their equipment manufacturers."  (*See* Lowell Rpt. at 6.)  As

17 such, the products' allegedly defective production bears a substantial relationship to

18 traditional maritime activity, and the court concludes that the second prong of the

19 connection test is also met.  Thus, the *Grubart/Sisson* factors are met, and Plaintiffs'

20 claims are subject to admiralty law.

21 //

22 //

1        **C.  Maritime Law in Asbestos Product Liability Litigation**

2             Having determined that maritime law applies, the court must now consider the

3    substantive content of that law with respect to Plaintiffs' claims and Carrier's and

4    Crane's motions.  Plaintiffs assert negligence and strict products liability claims based on

5    Mr. Nelson's alleged exposure to Carrier's and Crane's allegedly defective asbestos-

6    containing products and their failure to warn concerning the hazards of asbestos.  (*See* 3d

7    Am. Compl. ¶ 81.)  Both Crane and Carrier have moved for summary judgment with

8    respect to causation asserting that Plaintiffs have failed to provide sufficient evidence of

9    Mr. Nelson's exposure to their products or to any asbestos allegedly associated with their

10   products.  Defendants also argue that they have no duty to Mr. Nelson with respect to

11   replacement or other asbestos-containing products that may be associated with their

12   products, but are nevertheless manufactured or distributed by others.  (*See generally*

13   Carrier Mot.; Crane Mot.)

14       **1.  Causation**

15            Maritime law reflects the prevailing view of the law of the land.  *East River S.S.*

16   *Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986); *see also Saratoga*

17   *Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 878 (1997) (explaining that maritime

18   law "is an amalgam of traditional common-law rules, modifications of those rules, and

19   newly created rules, drawn from both state and federal sources.") (internal quotations

20   omitted).  As such, maritime law recognizes a general theory of liability for negligence

21   and also incorporates principles of products liability, including strict liability.  *East River,*

22   476 U.S. at 865-66.

1    Unfortunately, the Ninth Circuit has not yet addressed the element of causation

2  under maritime law in the context of a products liability action involving asbestos. *See*

3  *Cabasug v. Crane Co.* 989 F. Supp. 2d 1027, 1033 (D. Haw. 2013).  Carrier urges the

4  court to follow *Lindstrom v. A-C Product Liability Trust,* 424 F.3d 488 (6th Cir. 2005),

5  which is the only circuit court to have addressed causation for asbestos exposure under

6  maritime law, and *Cabasug*, 989 F. Supp. 2d 1027 at 1033-38, which found that the Ninth

7  Circuit would follow *Lindstrom*'s guidance.  (*See* Carrier Mot. at 7-8.)  The court is

8  largely persuaded by the analysis contained in these two cases with respect to the issue of

9  causation as discussed below.

10    *Lindstrom* involves facts similar to those before the court.  In *Lindstrom*, a seaman

11  who had worked in the engine department of multiple vessels brought product liability

12  claims against several manufacturers for damages due to mesothelioma allegedly caused

13  by various pieces of asbestos-containing equipment onboard the ships.  The *Lindstrom*

14  court held that the plaintiff must show for each defendant that (1) the plaintiff was

15  exposed to the defendant's product, and (2) the product was a substantial factor in

16  causing the injury the plaintiff suffered.  *Lindstrom*, 424 F.3d at 492.  The court found

17  that evidence of "substantial exposure for a substantial period of time" is sufficient to

18  raise an inference that the product was a substantial factor in causing the injury.  *Id.*  A

19  mere showing the defendant's product was present somewhere at the plaintiff's

20  workplace is insufficient; rather, a plaintiff "must show 'a high enough level of exposure

21  that an inference that the asbestos was a substantial factor in the injury is more than

22  conjectural.'"  *Cabasug*, 989 F. Supp. at 1037 (quoting *Lindstrom*, 424 F.3d at 492).

ORDER- 24

1    Following *Lindstrom*, the Multi-District Litigation ("MDL") asbestos action also

2    adopted and applied this standard for causation in asbestos cases applying maritime law.

3    *See Cabasug*, 989 F. Supp. 2d at 1034 (citing cases).  In addition, at least one other

4    district court within this circuit other than *Cabasug* has also recited this standard for

5    causation in maritime asbestos product liability cases.  *See, e.g.*, *Whalen v. Gen. Elec.*

6    *Corp.*, No. C 14-00436 WHA, 2014 WL 1347857, at *2 (N.D. Cal. Apr. 3, 2014) ("For

7    defendants to be liable under maritime law for injuries caused by asbestos, whether it is

8    strict liability or negligence, plaintiffs must establish causation with respect to each

9    defendant . . . by showing:  (1) claimant was exposed to defendants' products; and (2) the

10   products were a substantial factor in causing the alleged injury.").

11       Interpreting *Lindstrom*, the *Cabasug* court stated that although "evidence that [the

12   plaintiff] worked on a vessel in which a [d]efendant's products were present, on its own,

13   is insufficient" to survive summary judgment, the plaintiff "may . . . raise a genuine issue

14   of material fact by presenting direct evidence that [the plaintiff] worked on (or,

15   depending on the particular fact[s], near) the asbestos-containing components of specific

16   products."  *Id.*  A plaintiff may also defeat summary judgment by "present[ing]

17   circumstantial evidence of exposure" by showing "that [the defendant's] products were

18   prevalent on the vessels on which [the plaintiff] worked and that [the plaintiff] regularly

19   worked on those types of products."  *Id.* at 1037-38.

20       The *Casabug* court noted that the rule in *Lindstrom* stood in contrast to the more

21   relaxed test outlined by the Washington Supreme Court in *Lockwood v. AC & S, Inc.*, 744

22   P.2d 605 (Wash. 1987), which held that "the sufficiency of the evidence of causation will

1   depend on the unique circumstances of the case," including evidence of the plaintiff's

2   proximity to the asbestos when exposure occurred, the expanse of the workplace where

3   asbestos fibers were released, the extent of time the plaintiff was exposed, the types of

4   asbestos products to which the plaintiff was exposed, and how those products were

5   handled.[9]  *Id.* at 613.  The *Lockwood* court held that the plaintiff had established a prima

6   facie case by presenting evidence that defendant's asbestos containing products were in

7   his workplace, that asbestos dust can remain in the air and drift with the currents for a

8   long period of time, and that exposure to asbestos has a cumulative effect in contributing

9   to asbestos-related disease.  *Id.* at 613 ("[I]t is reasonable to infer that since the product

10  was used on that ship when [the plaintiff] worked there, [the plaintiff] was exposed to

11  it.").

12      The *Cabasug* court noted that the *Lockwood* approach in finding that the mere

13  presence of the defendant's product coupled with asbestos fiber-drift evidence is

14  sufficient to justify submission of the issue of causation to the jury has been criticized as

15  "nontraditional."  *Cabasug*, 989 F. Supp. 2d at 1036 (citing *Robertson v. Allied Signal,*

16  *Inc.*, 914 F.2d 360, 381-82 (3d Cir. 1990) and *Blackston v. Shook & Fletcher Insulation*

17  *Co.*, 764 F.2d 1480, 1481 (11th Cir. 1985)).  Indeed, even the *Lockwood* court appears to

18  acknowledge that due to the "unusual problems involved in product identification" in

19

20  _____

21      [9] The foregoing list applies to a plaintiff's alleged exposure to the defendant's product.
    To establish causation, however, the *Lockwood* court added that "trial courts must consider the
22  evidence presented as to medical causation of the plaintiff's particular disease."  744 P.2d at 613.

1  asbestos cases, it was "eas[ing] the strict requirements of the traditional approach" to

2  causation.  *See Lockwood*, 744 P.2d at 612, n.6.

3      In determining the appropriate framework for causation under maritime law, the

4  court is mindful that the purpose of maritime jurisprudence "is to create 'a uniform and

5  specialized body of federal law' applicable to the maritime shipping industry." *Cabasug*,

6  989 F. Supp. 2d at 1036 (quoting *Adams v. Montana Power Co.*, 528 F.2d 437, 439 (9th

7  Cir. 1975)).  The *Cabasug* court concluded that "*Lindstrom* and the MDL action have

8  spoken as to how causation is determined under maritime law, and their view is generally

9  consistent with the majority of state law cases addressing this issue." *Id.*  This court

10 concurs with that assessment and further agrees that *Lindstrom* is consistent with Ninth

11 Circuit guidance generally on maritime tort law.  *See id.*  Accordingly, the court finds that

12 to demonstrate causation with respect to an asbestos product liability claim under

13 maritime law, Plaintiffs must show that (1) Mr. Nelson was exposed to each of

14 Defendants' products, and (2) such product was a substantial factor in causing Mr.

15 Nelson's injury.  *See id.* at 1037.

16      In determining whether Plaintiffs have presented sufficient evidence to raise a

17 reasonable inference that exposure to a particular defendant's product was a substantial

18 factor in Mr. Nelson's injury, the court's analysis will be guided by the particular facts

19 before it as to each defendant and each product.  *See id.*  As noted above, Plaintiffs may

20 raise a genuine issue of material fact concerning exposure by presenting either direct or

21 circumstantial evidence that Mr. Nelson worked on a particular defendant's asbestos-

22 containing product (or near it while others worked on it) and that such work would create

1   the conditions necessary for asbestos exposure.[10]  *See id.* at 1037-38.  Ultimately,

2   however, "each case depends on the particular facts presented."  *Id.*

3   ## 2.  Products Manufactured by Others

4       Crane asserts that it may not be held liable for replacement parts that may have

5   been manufactured by others and applied to its valves after their initial installation aboard

6   the Kitty Hawk.  (Crane Mot. at 8-9.)  Carrier asserts a similar argument with respect to

7   its products.  (Carrier Mot. at 10-11.)

8       Once again, Carrier relies on maritime law for this portion of its motion (*see*

9   Carrier Mot. at 10 (citing *Lindstrom*, 424 F.3d at 494-97)), while Crane relies on

10  Washington law (Crane Mot. at 8-9 (citing *Simonetta v. Viad Corp.*, 197 P.3d 127 (Wash.

11  2008) and *Braaten v. Saberhagen Holdings, Inc.*, 198 P.3d 493 (Wash. 2008)).  With

12  respect to this issue, however, there is no distinction between Washington law and

13  maritime law.  *See, e.g.*, *Stevens v. CBS Corp.*, No. 3:11-cv-06073, 2012 WL 5844704, at

14  *2 (W.D. Wash. Nov. 19, 2012) (finding no conflict between Washington and maritime

15  law with respect to the defense that manufacturers of "bare-metal" equipment are not

16  liable for materials later added to the equipment, even if the manufacturer knew that the

17   

18  [10] The *Cabasug* court noted that "where [the plaintiff has] raised a genuine issue that [he] was exposed to asbestos components of a product in the course of his regular duties, expert testimony that *every* asbestos exposure increases the individual's risk of developing

19  mesothelioma may support the reasonable inference that asbestos from the [d]efendant's product was a substantial factor in causing Plaintiff's injuries." 989 F. Supp. 2d at 1038 (italics in

20  original).  Although neither Crane nor Carrier have challenged this aspect of Plaintiffs' evidence on summary judgment, the court notes that Plaintiffs have submitted this type of expert

21  testimony.  (*See* Raterman Rpt. (Dkt. # 146) at 12 ("The medical literature has established malignant mesothelioma . . . as, in general, a dose response disease, that is, each exposure to asbestos-containing dust has been shown to contribute to cause diffuse malignant

22  mesothelioma . . . ."); Brodkin Decl. ¶¶ 21-25.)

1  materials in question would be added).  In *Braaten*, the Washington Supreme Court held

2  that a defendant "may not be held liable in common law products liability or negligence

3  for failure to warn of the dangers of asbestos exposure resulting from another

4  manufacturer's insulation applied to its products after sale of the products to the navy."

5  198 P.3d at 495 (citing *Simonetta*, 197 P.3d 127).  Similarly, in *Lindstrom*, the court also

6  concluded that although the defendant's valves and gaskets contained asbestos

7  components, the defendant could not be held liable where the original asbestos parts had

8  been replaced and there was no evidence that the defendant had supplied the replacement

9  parts or that the plaintiff had ever handled the original asbestos components.  *See*

10  *Lindstrom*, 424 F.3d at 493-97.

11     The *Cabasug* court relied both on *Lindstrom*, as well as *Braaten* and *Simoneta*, in

12  finding that "the Ninth Circuit would determine that under maritime law, a manufacturer

13  is not liable for replacement [or other] parts that it did not place in the stream of

14  commerce, whether the manufacturer's product originally contained asbestos components

15  or was designed to include asbestos components."[11]  989 F. Supp. 2d at 1041.  The court

16  is persuaded by this analysis and likewise concludes that the Ninth Circuit would adopt

17  this rule under maritime law.  *See id.*; *see also Connor*, 842 F. Supp. 2d at 801-02.

18  //

19  

---

20  [11] Further, as also noted by the *Cabasug* court, this rule is in line with the Restatement
(Second) of Torts § 402A, "which suggests that the duty to warn is limited to entities within a

21  product's chain of distribution because such entities are in the best position to absorb the costs of
such warnings into the cost of the replacement parts."  *Cabasug*, 989 F. Supp. 2d at 1041 (citing

22  *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 801-02 (E.D. Pa. 2012)).

1        **D.  Crane's Motion**

2        Crane moves for summary judgment in part concerning Mr. Nelson's alleged

3   exposure to asbestos from Crane products while he was at the Great Lakes Naval

4   Training Center.  (Crane Mot. at 3.)  Plaintiffs concede that they have "no evidence that

5   Mr. Nelson was exposed to asbestos parts supplied by Crane when he was at the Great

6   Lakes Naval Training Center."  (Resp. to Crane at 1, n.1.)  The court, therefore,

7   GRANTS this portion of Crane's motion.

8        The lion's share of Crane's motion, however, pertains to Mr. Nelson's alleged

9   exposure to asbestos from Crane products while he served aboard the Kitty Hawk.  (*See*

10  *generally* Crane Mot.)  Crane asserts that "Plaintiffs have failed to provide any evidence

11  that Mr. Nelson was ever exposed to an asbestos-containing product for which Crane . . .

12  could be responsible."[12]  (*Id.* at 5.)  Crane argues that Plaintiffs failed to meet the

13

14  _____

        [12] Crane breaks its argument into three sections.  (*See* Mot. at 5-9.)  Crane argues both
15  that (1) there is no evidence that Mr. Nelson was exposed to an asbestos-containing product
    manufactured by Crane (*id.* at 5-7); (2) that there is no evidence of medical causation (*id.* at 7);
16  and (3) that it cannot be held liable for products made or supplied by others based on *Braaten*
    and *Simonetta* (*id.* at 8-9.)  Crane's motion with respect to medical causation, however, rests
17  again on its assertion that "there is no evidence that Mr. Nelson was ever actually exposed to
    asbestos from an original Crane . . . product.  (*Id* at 7.)  Thus, the two arguments are essentially
18  repetitive of one another, and the court considers them together.  In addition, with respect to
    medical causation, Crane never addresses in its motion the expert testimony of Plaintiffs'
19  industrial hygiene expert, Ms. Raterman, or Plaintiffs' occupational and environmental medicine
    expert, Dr. Brodkin, both of whom Plaintiffs rely upon to provide critical links in medical
    causation between Mr. Nelson's alleged exposures to asbestos from Crane valves aboard the
20  Kitty Hawk and his development of mesothelioma.  Because Crane did not address the testimony
    of these two expert witnesses in its motion, the court assumes Crane's motion for summary
21  judgment is not directed to the adequacy of their testimony concerning medical causation.
    Crane's final argument concerning its lack of duty with respect to products manufactured by
22  others (*id.* at 8-9) again rests on the notion that "Plaintiffs have offered no evidence to show that
    Mr. Nelson was exposed to any asbestos-containing material manufactured, sold, designed, or

1   causation standard set forth in *Lockwood* (*see* Crane Mot. at 6), but as discussed above,

2   the court considers Crane's motion under the more stringent standard set forth in

3   *Lindstrom* that (1) the plaintiff was exposed to the defendant's product, and (2) the

4   product was a substantial factor in causing the injury the plaintiff suffered.  *See*

5   *Lindstrom*, 424 F.3d at 492.  Crane directs its motion to the first part of the causation test.

6   (*See generally* Crane Mot.)  Thus, under *Lindstrom*, in order to survive summary

7   judgment with respect to causation, Plaintiffs must present sufficient evidence to raise a

8   reasonable inference that Mr. Nelson was exposed to asbestos from a Crane valve while

9   he served on board the Kitty Hawk.

10          Crane relies on testimony from Mr. Nelson in which he admits that he does not

11   know the maintenance history of the Kitty Hawk from the time she was launched in 1958

12   or 1959 until his participation in her maiden voyage in 1961, and he does not know the

13   maintenance history of any particular Crane valve or specifically whether any valve on

14   which he worked contained their original component parts.  (Crane Mot. at 6-7 (citing

15   selected portions of Mr. Nelson's deposition).)

16          Crane's argument, however, ignores other portions of Mr. Nelson's testimony in

17   which he testified that when he joined the ship his responsibilities included working on

18   "all types of valves," that Crane valves were prevalent on board, and that "[e]verything

19   looked brand new."  (10/27/14 Knudsen Decl. Ex. 2 at 20:5-20, 21:4-5, 50:7-8, 83:10-15,

20

---

21   otherwise placed into the stream of commerce by Crane. . . ." (*id.* at 9).  Thus, the court treats all
    of these portions of Crane's motion as one motion based on the foregoing premise.

22

ORDER- 31

89:24-25.)  He also stood watch, observed, and assisted yard or civilian workers while they repaired or overhauled valves during the Kitty Hawk's haul-out at Hunter's Point Naval Shipyard, and occasionally worked on the valves himself during the haul-out.  (*Id.* Ex. 2 at 39:1-5, 40:8-41:17, 43:16-24, 47:2-12, 47:18-48:10.)  He specifically recalls working with or around five specific types of Crane valves while he was assigned to the Kitty Hawk.  (*Id.* Ex. 4. at 4.)  He also specifically testified that he could tell the valves he worked on were new and had not previously been worked on because the valves looked as if they had not been disturbed and appeared to have original paint.  (11/3/14 Knudsen Decl. Ex. 9 at 193:10-13.)  In addition, he testified that valve manufacturers supplied the equipment, packing, gaskets, and everything else that was needed to maintain or fix the valves.  (10/27/14 Knudsen Decl. Ex. 3 at 17:15-20.)

The fact that Mr. Nelson may have acknowledged in other portions of his testimony that he was unfamiliar with the specific maintenance record of the Kitty Hawk prior to his arrival on board or with respect to the specific valves on which he worked or that he did not know whether the valves on which he worked on contained original component parts is certainly fodder for cross examination at trial.  The jury, however, is entitled to assess these portions of Mr. Nelson's testimony in conjunction with Mr. Nelson's other testimony concerning his specific identification of Crane valves onboard the Kitty Hawk, his work on those valves, and the appearance of valves on the ship during its maiden voyage as brand new and undisturbed.

Moreover, in its motion, Crane ignores documentary evidence offered by Plaintiffs that tends to corroborate Mr. Nelson's testimony concerning the presence of Crane valves

1  aboard the Kitty Hawk, that Crane supplied its steel and bronze valves with asbestos-

2  containing packing material, and that at least some Cranes valves contained original

3  asbestos parts.  (10/27/14 Knudsen Decl. Exs. 5-7.)  In addition, Plaintiffs offer at least

4  one 1965 document indicating that Crane supplied asbestos-containing replacement parts

5  to the Kitty Hawk.  (*Id.* at Ex. 8.)  Although the 1965 document post-dates Mr. Nelson's

6  service, the court agrees with Plaintiffs that, viewing the evidence in light most favorable

7  to them and in conjunction with other evidence and testimony offered by Plaintiffs, it

8  creates an inference that Crane supplied asbestos-containing replacement parts during

9  Mr. Nelson's tenure aboard the Kitty Hawk.

10      Finally, in its motion, Crane also ignores the testimony of Plaintiffs' naval expert,

11  Captain Lowell, who opines, based in part on his review of Mr. Nelson's deposition and

12  records from the National Archives, that Mr. Nelson more probably than not came into

13  contact with original asbestos materials from Crane valves aboard the Kitty Hawk.[13]

14  (Lowell Rpt. at 28-30.)  Captain Lowell also opines, in sync with Mr. Nelson's deposition

15  testimony about replacement parts aboard the Kitty Hawk (10/27/14 Knudsen Decl. Ex. 3

16  at 17:15-20), that original equipment manufacturers, including Crane, often sold

17  asbestos-containing replacement parts to both naval shipyards and the Navy Supply

18  System.  (*See* Lowell Rpt. at 35.)

19      Viewing all of this evidence in the light most favorable to Plaintiffs as is required

20  on a motion for summary judgment, *see Natural Res. Def. Council, Inc. v. U.S. Dep't of*

21  _____

22  [13] Although Crane objects to Captain Lowell's testimony in its reply memorandum
    (Crane Reply at 4), the court overrules that objection.  (*See supra* note 4.)

1   *Transp.*, 770 F.3d at 1260, 1263 (9th Cir. 2014), the court concludes that Plaintiffs have

2   raised a reasonable inference that Mr. Nelson was exposed to asbestos-containing

3   products or materials manufactured by Crane while he worked aboard the Kitty Hawk

4   and that the jury is entitled to consider and weigh both Plaintiffs' and Crane's evidence in

5   that regard.  Accordingly, the court DENIES Crane's motion for summary judgment with

6   regard to the period of time that Mr. Nelson served aboard the Kitty Hawk.

7      **E.  Carrier's Motion**

8          Carrier's motion for summary judgment pertains both to Mr. Nelson's alleged

9   exposure to asbestos from Carrier-manufactured air conditioning equipment and Carrier-

10  manufactured turbines aboard the Kitty Hawk.  (Carrier Mot. at 9-10.)  Carrier asserts

11  that Plaintiffs raise insufficient evidence linking Carrier to the turbines attached to the

12  main feed pumps, and that, even if Carrier did manufacture the turbines, Mr. Nelson

13  never testifies that he worked on those turbines, but only on the associated Ingersoll-Rand

14  main feed pumps.  (*Id.* at 9.)  In addition, Carrier similarly argues that Plaintiffs produce

15  insufficient evidence linking Carrier to any of the air conditioning units on which Mr.

16  Nelson worked.  (*Id.* at 10.)  Finally, Carrier argues that even if Plaintiffs offer sufficient

17  evidence linking Carrier to either the turbines or the refrigeration units, Plaintiffs offer

18  insufficient evidence that any of the component parts to which Mr. Nelson was exposed

19  were original, and Carrier cannot be held liable for replacement parts supplied by others.

20  (*Id.* at 10-11.)

21         As an initial matter, the court finds that Plaintiffs have failed to raise a genuine

22  issue of fact concerning Mr. Nelson's exposure to asbestos from main feed pump turbines

1   manufactured by Carrier.  First, unlike his testimony concerning Crane valves, Mr.

2   Nelson never identifies Carrier as the manufacturer of any turbines, pumps, or any other

3   equipment aboard the Kitty Hawk.  When specifically asked about any work he may have

4   done on turbines, he testifies that he remembers some pumps with turbines, but could not

5   identify which pumps.  (11/3/14 Knudsen Decl. Ex. 12 at 49:15-50:8.)  Although Mr.

6   Nelson does not identify Carrier as the manufacturer of the main feed pump turbines,

7   Captain Lowell offers his expert opinion that Carrier manufactured these turbines.

8   (Lowell Rpt. at 23.)  As noted above, Captain Lowell bases this opinion largely on

9   documents from the National Archives.  (*See* 11/3/14 Knudsen Decl. Exs. 2-3.)

10        Even if, however, Plaintiffs have submitted sufficient evidence through Captain

11  Lowell concerning the identity of Carrier as the turbines' manufacturer, there is

12  insufficient evidence of Mr. Nelson's exposure to asbestos from the turbines.  Although

13  Mr. Nelson testifies that he worked on and around the Ingersol-Rand main feed pumps

14  both while the Kitty Hawk was underway during her maiden voyage and while she was

15  hauled out at Hunter's Point Naval Shipyard (*Id.* Ex. 9 at 165:20-23, 168:8-20, 183:1-

16  184:23), he never testifies that he worked on the associated Carrier turbines.  Further, the

17  court could find no deposition testimony from Mr. Nelson indicating that he worked

18  around or near the Carrier turbines while others worked on them.

19        Plaintiffs try to get around this fact by offering testimony from Captain Lowell

20  that the Ingersoll-Rand main feed pumps and the Carrier turbines were so integrated as a

21  system that when Mr. Nelson described working on the main feed pumps he was really

22  talking about working on both integrated pieces of equipment.  (*See* 11/3/14 Knudsen

1    Decl. Ex. 4 at 249:4-23.)  Captain Lowell, however, acknowledges on cross examination

2    that he does not know with certainty Mr. Nelson's perspective with regard to the

3    integrated or delineated nature of the main feed pumps and their associated turbines

4    (Mackenzie Decl. Ex. A at 248:3-24), and there is no testimony from Mr. Nelson on that

5    issue.  In the end, Captain Lowell acknowledges that "all [he] knows" is that Mr. Nelson

6    "said he worked on the main feed pumps."  (*Id.*)

7           In the end, all the court can say it knows too is that Mr. Nelson recalls working on

8    the main feed pumps and around them while others worked on them.  There is no similar

9    testimony, however, with respect to the associated Carrier turbines.  The court concludes

10   that Plaintiffs have failed to raise a reasonable inference that Mr. Nelson worked on the

11   Carrier turbines or around them while others worked on them.  Accordingly, the court

12   concludes that, when construing the evidence in the light most favorable to Plaintiffs, no

13   reasonable juror could conclude that Mr. Nelson was exposed to asbestos from a Carrier

14   turbine and any such finding would be impermissibly conjectural.  The court, therefore,

15   grants this aspect of Carrier's motion.[14]

16          Turning to Mr. Nelson's claims concerning his work aboard the Kitty Hawk on air

17   conditioning equipment, the court concludes that Mr. Nelson provides sufficient

18   _____

19   [14] Plaintiffs urge the court to apply the more lenient standard for causation in asbestos
     product liability cases found in Washington law under *Lockwood*, 744 P.2d at 613.  (*See* Resp to

20   Carrier Mot. at 14.)  Because the court has concluded that *Lindstrom*, not *Lockwood*, provides
     the correct standard under maritime law with respect to causation (*see supra* § III.B), it need not

21   decide this issue.  Nevertheless, given the paucity of evidence concerning Mr. Nelson's exposure
     to any Carrier turbine—let alone exposure to asbestos from a Carrier turbine, the court is not

22   persuaded that the result here would be any different even under *Lockwood*'s more generous
     approach to causation.

ORDER- 36

1    circumstantial evidence, when viewed in the light most favorable to Plaintiffs, to create

2    an inference that a reasonable juror could rely upon to link Carrier to the air conditioning

3    units aboard the Kitty Hawk.  Even under the more stringent causation standards of

4    maritime law, circumstantial evidence may be sufficient to defeat summary judgment.

5    *See Cabasug*, 989 F. Supp. 2d at 1037-38 ("Plaintiffs may present circumstantial

6    evidence of exposure," and "the court rejects Defendants' arguments that [p]laintiffs must

7    present direct evidence the [plaintiff] recalled working on a particular product by the

8    [d]efendant . . . .").

9         Similar to his testimony concerning the main feed pump turbines, Mr. Nelson fails

10   to provide direct evidence linking Carrier to the air conditioning units he worked on

11   while aboard the Kitty Hawk.  Specifically, he testifies:

12       Q:  One of the things you said was that you associated the name Carrier
         with air conditioning equipment?

13

14       A:  Air conditioning, refrigeration.

         Q:  Is that just a general statement for your knowledge of air conditioning
15       systems, or is that related to the work you did on the Kitty Hawk?

16       A:  General.

17                              **********

18       A:  I know in the—outside out of the—the Navy that Carrier does have—
         makes air conditioning units and refrigeration units.

19

20       Q:  So do you recall the name Carrier from any of the work that you did on
         the Kitty Hawk?

21       A:  No.

22   (Mackenzie Decl. Ex. B (Nelson Dep. Vol. II) at 210:3-16.)

1    Instead of relying on Mr. Nelson's direct testimony to provide the evidentiary link

2    between Carrier and Mr. Nelson's work on air conditioning units aboard the Kitty Hawk,

3    Plaintiffs rely on circumstantial evidence provided by their naval expert, Captain Lowell.

4    (*See* Resp. to Carrier at 14.)  Captain Lowell opines, based in part on his review of the

5    1961 Report of Final Acceptance, that the air-conditioning units aboard the Kitty Hawk

6    were manufactured by Carrier.  Specifically, he testifies that there were seven Carrier air

7    conditioning units aboard the Kitty Hawk and that "the air-conditioning was done by

8    Carrier and York [Company] did the refrigeration."  (*See* Mackenzie Decl. Ex. A at

9    240:3-17 ("Q:  So to summarize, . . . seven-conditioning plants, as you called them?  A:

10   Yes, sir."), 254:1-11 ("A:  It's my belief that the air-conditioning was done by Carrier

11   and York did the refrigeration . . . ."); 11/3/14 Knudsen Decl. Ex. A at VIII-11.)

12    As an initial matter, Carrier objects to Captain Lowell's opinion testimony as

13   simply his own *ipse dixit* or "say so."  (Carrier Mot. at 10.)  The court rejects this notion.

14   Captain Lowell provides an extensive description of his training and experience in the

15   field of marine engineering and his decades-long career in United States Naval Reserves,

16   as well as the basis for his familiarity with and qualifications for interpreting the types of

17   documents he reviewed from the National Archives in preparation for rendering his

18   opinions in this case.  (Lowell Rpt. at 1-6.)  Carrier never objects to or challenges Captain

19   Lowell's credentials or qualifications.  (*See generally* Carrier Mot.)  Captain Lowell

20   examines documentation obtained from the National Archives utilizing his training and

21   experience in the area to interpret those documents.  (*See generally* Lowell Rpt.;

22   Mackenzie Decl. Ex. B; 11/3/14 Knudsen Decl. Ex. 1.)  Carrier may disagree with

1  Captain Lowell's interpretation or believe that it is ill-founded, but that does not mean

2  that Captain Lowell's interpretation of the documentation is merely *ipse dixit*.  Further, as

3  the Ninth Circuit instructs "questions regarding the nature of [an expert witness's]

4  evidence [go] more to the 'weight' of his testimony—an issue properly explored during

5  direct and cross-examination."  *Hangarter v. Provident Life and Accident Ins. Co.*, 373

6  F.3d 998, 1017, n.14 (9th Cir. 2004) (citing *Children's Broad. Corp. v. Walt Disney Co.*,

7  357 F.3d 860, 865 (9th Cir. 2004) ("[T]he factual basis of an expert opinion goes to the

8  credibility of the testimony, not the admissibility, and it is up to the opposing party to

9  examine the factual basis for the opinion in cross-examination.").

10      Carrier argues that the 1961 Report of Final Acceptance "lead[s] to an equally

11  logical conclusion that York manufactured the air-conditioning unit."  (Carrier Mot. at

12  10.)  This may be so, but that is not how the court must view the evidence on a motion for

13  summary judgment.  Carrier cannot win summary judgment by offering "an equally

14  logical" interpretation of Plaintiffs' evidence.  It is axiomatic that the court must view the

15  evidence in the light most favorable to Plaintiffs and draw all inferences in Plaintiffs'

16  favor.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31

17  (9th Cir. 1987) (holding that on summary judgment the court must view the facts and

18  draw all inferences in the light most favorable to the nonmoving party).  Viewing the

19  evidence in this light, the court concludes that Plaintiffs have raised a reasonable

20  evidentiary inference based on circumstantial evidence provided by Captain Lowell that

21  the air conditioning units aboard the Kitty Hawk during Mr. Nelson's term of service

22  were manufactured by Carrier.  This evidence, in combination with Mr. Nelson's direct

1 testimony concerning the maintenance and repair work he conducted on the air

2 conditioning units aboard the Kitty Hawk during the last portion of his service there, is

3 sufficient to defeat this portion of Carrier's motion for summary judgment.  Plaintiffs

4 have raised a reasonable inference that Mr. Nelson worked on Carrier manufactured air

5 conditioning units aboard the Kitty Hawk.  As Plaintiffs acknowledge, Captain Lowell's

6 interpretation of the phraseology used in the 1961 Report of Final Acceptance is certainly

7 fertile ground for cross-examination at trial (Resp. to Carrier at 14) and Carrier's

8 interpretation of the document may well be the interpretation that ultimately prevails at

9 trial.  Simply exposing a weakness in an expert's opinion that may be explored on cross-

10 examination, however, is insufficient grounds for summary judgment where the court

11 must draw all reasonable inferences in Plaintiffs' favor.  It is for the jury to decide which

12 interpretation of the 1961 Report of Final Acceptance is ultimately the correct one.

13 Accordingly, the court denies Carrier's motion for summary judgment concerning Mr.

14 Nelson's asbestos exposure related to Carrier air conditioning units aboard the Kitty

15 Hawk.[15]

16 _____

17     [15]Carrier cites three district court decisions in its reply memorandum to support its
   argument that Plaintiffs' reliance on Captain Lowell's expert testimony to avoid summary
18 judgment is insufficient.  (See Carrier Reply (Dkt. # 173) at 3-4 (citing In re Asbestos Prods.
   Liability Litig., No. 10-67422, 2011 WL 5506027 (E.D. Pa. July 5, 2011); Simpson v. Kaiser
19 Ventures, LLC, No. 08-04489, 2012 Wl 35363321 (E.D. Pa. July 24, 2012); Robertson v. Carrier
   Corp., No. 08-04490, 2012 WL 2989174 (E.D Pa. June 25, 2012)).)  These cases, however, are
20 distinguishable.  In In re Asbestos, the court found the expert's testimony concerning the
   decedent's proximity to the products at issue aboard the ship to be inadequate to avoid summary
21 judgment where the decedent had never described his work on the products.  See 2011 WL
   5506027, at *1, n.1.  In contrast, Mr. Nelson provides detailed deposition testimony concerning
22 his extensive work and maintenance on the air conditioning units aboard the Kitty Hawk.
   (10/27/14 Knudsen Decl. Ex. 2 at 67:18-69:22; 11/3/14 Knudsen Decl. Ex. 9 at 70:17-73:18.)  In

1        Finally, Carrier asserts that it is entitled to summary judgment with respect to Mr.

2   Nelson's claims because he cannot prove that any of the air conditioning parts he worked

3   on while aboard the Kitty Hawk were either original or replacement parts supplied by

4   Carrier.  (Carrier Mot. at 10-11.)  In response, Plaintiffs offer testimony from one of

5   Carrier's Federal Rule of Civil Procedure 30(b)(6) deponents in another asbestos

6   litigation who testified that the only legitimate place to obtain replacement parts for the

7   Navy with respect to Carrier products is from Carrier or a Carrier authorized parts dealer.

8   (11/3/14 Knudsen Decl. Ex. 14 at 54:19:-57:21.)  Carrier did not object to this testimony

9   or Plaintiffs' reliance upon it in its reply memorandum.  (*See generally* Carrier Reply.)

10  In fact, Carrier never responds to Plaintiffs' reliance upon this testimony at all.  The court

11  finds that, viewing the evidence in the light most favorable to Plaintiffs, this testimony

12  raises a reasonable inference that Carrier supplied replacement part for its products

13  aboard the Kitty Hawk.  The court, therefore, denies Carrier's motion for summary

14

15

---

16  *Robertson*, the court held that the expert's opinion was inadmissible because "he is not qualified
    as an expert" and his opinions are "based on subjective belief and/or unsupported speculation."

17  2012 WL 2989174, at *1, n.1.  In particular, the expert in *Robertson* based his conclusion that he
    decedent was exposed to asbestos based on "his own personal 'testing' of gaskets—without any

18  details or explanation of the method or means of scientific analysis."  *Id.*  The court further found
    that the expert did not provide sufficient explanation of the selection of documents he chose to

19  review with respect to formulation of his opinions.  *Id.*  These are not grounds, however, upon
    which Carrier challenges Captain Lowell's testimony and accordingly the court finds *Roberts* to

20  be inapposite here.  Finally, *Simpson* involved the exclusion of expert testimony that insulation
    removed while the plaintiff was onboard a ship was original despite the fact that 11 or 12 years

21  had passed between the removal and the original lay-down as speculative.  *See* 2012 WL
    3536321, at *1, n.1.  This factual scenario is entirely distinct from the situation before this court

22  where Mr. Nelson joined the Kitty Hawk on its maiden voyage and the documentary evidence
    relied upon by Captain Lowell is contemporaneous with Mr. Nelson's service.

ORDER- 41

1   judgment as it pertains to Mr. Nelson's claims with respect to his alleged exposure to

2   asbestos from Carrier refrigeration units aboard the Kitty Hawk.

3                                IV.    CONCLUSION

4         Based on the foregoing, the court GRANTS in part and DENIES in part Crane's

5   motion for summary judgment (Dkt. # 155) and GRANTS in part and DENIES in part

6   Carrier's motion for summary judgment (Dkt. # 158).

7         Dated this 9th day of December, 2014.

8

9                                           _____

10                                          JAMES L. ROBART
                                            United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 42